# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| JOE BALTAS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:20cv00276 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| HAROLD W. CLARKE, *et al.*, | ) | By:  Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

Plaintiff Joe Baltas, an inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983. Baltas alleges that the 21 separate defendants violated his federal rights. This matter is before the court on defendants' motions to dismiss. Having reviewed the pleadings, the court will grant the defendants' motion to dismiss in part, and deny them in part.[1]

## I.

The following facts are taken from Baltas's amended complaint and, at this stage, his factual allegations are accepted as true. *See Albright v. Oliver*, 510 U.S. 266, 268 (1994).

Baltas is a Connecticut inmate housed in the Virginia Department of Corrections ("VDOC") at Red Onion State Prison ("Red Onion") for an "indefinite" period of time under an Interstate Corrections Compact ("ICC") between Connecticut and Virginia.[2]

---

[1] The court will also dismiss several claims against several defendants pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) because they fail to state a cognizable federal claim.

[2] Baltas submits a Contract for the Implementation of the Interstate Corrections Compact, signed in 1986 by the then-Commissioner of the Connecticut Department of Corrections and the then-Deputy Director and Compact Administrator for the VDOC. (*See* ECF No. 2.) It is unclear whether this document is fully executed; for purposes of considering defendants' motions to dismiss, however, the court will assume this document is in effect, as Baltas asserts. Pursuant to the contract, while in the custody of Virginia, Baltas is "subject to all the provisions of law and regulations" applicable to other inmates in Virginia.

Baltas claims that "prior to December 20, 2019," defendant VDOC Director Harold Clarke and defendant Commissioner Connecticut Department of Corrections ("CDOC") Commissioner Rollin Cook "entered into a contractual agreement to transfer [Baltas] from Conn[ecticut] to Virginia . . . under interstate compact laws and provisions of the contract." Baltas was then "involuntarily" transferred from Connecticut to Virginia on December 20, 2019. Baltas states that both CDOC and VDOC officials told him that he was transferred to Virginia "as a result of his litigation against [the CDOC] and to hinder said litigation."[3] Baltas complains that, upon being transferred to Virginia, he was immediately placed at Red Onion, with "no notice, no hearing, and no ability to appeal [his] placement." Baltas also states that during the intake process at Red Onion, his sweatpants were seized, even though he had been allowed to possess them in Connecticut. He also completed a medical intake where he informed nursing staff of his asthma, hypertension, depression, and antisocial and borderline personality disorders. Baltas claims that after the intake process, he was placed in a "mental-health cell," even though he "asserted clearly that he was not suicidal in any manner." Baltas complains that the conditions of the mental-health cell were "horrific and harsh."[4]

---

[3] The court notes that Baltas currently has five cases pending in the United States District Court for the District of Connecticut. *See Baltas, et al., v. Chapdelaine, et al.*, Civil Action No. 3:17cv242 (D. Conn. Feb. 15, 2017); *Baltas v. Frenis, et al.*, Civil Action No. 3:18cv1168 (D. Conn. July 16, 2018); *Baltas v. Rivera, et al.*, Civil Action No. 3:19cv1043 (D. Conn. July 1, 2019); *Baltas v. Erfe, et al.*, Civil Action No. 3:19cv1820 (D. Conn. Nov. 15, 2019); *Baltas v. Maiga, et al.*, Civil Action No. 3:20cv1177 (D. Conn. Aug. 13, 2020).

[4] Baltas states that the cells in that housing unit did not have running water, had toilets that had to be flushed by staff (and were only flushed once per shift), had no "visual stimuli," had no mirror, had no writing surface, hindered inmates' ability to communicate through cell doors because the doors has a rubber flap sealing the door, recycled stale air, were illuminated 24-hours a day, and were completely isolated. In addition, inmates housed in these cells: were only allowed one hour of recreation outside five days a week; were allowed three showers per week (on Tuesday, Friday, and Saturday and with one razor supplied); shaved in the shower without a mirror; used "community" nail clippers in the shower; had a scheduled cell cleaning day which staff "completely ignored"; and consumed all meals in cells.

Baltas alleges that on Saturday, December 21, 2019, he "began requesting cleaning supplies, rec[reation time], showers, access to a [tele]phone, and so on," but staff denied his requests and told him to raise the issues on Monday. He states that the meals he received in his cell were "unpalatable and the portion size was not up to the requirements of an adult male." He claims that when he complained about the meals, he was "simply told 'welcome to Red Onion.'" He was also denied a beverage because he had no personal "rubber cup" and the kitchen did not send cups to units. On Monday, December 23, 2019, Baltas asked defendants Officers Allen and Clem for a shower and change of clothes, but they denied his requests. Baltas then asked defendant Sgt. Little for recreation time, a shower, a change of clothes, and use of a telephone. Baltas also reported to Sgt. Little that Officers Allen and Clem had denied his previous requests. Baltas claims that Sgt. Little denied his requests and told him, "if my officers don't want to give you nothing, you ain't getting it from me."

Officials at Red Onion subsequently held a classification hearing. Baltas alleges that he received no notice of the hearing and that he was told that he would have to remain in the mental-health cell "until after the holidays due to administrators being on vacation." Baltas requested a shower and access to a telephone to call his attorney and his family; those requests were granted. Baltas alleges that Officers Allen and Clem were "irate" that they had to take him to the shower and, in retaliation, they denied him a meal. He claims that they told him that he had a choice between food or a shower and he had already chosen a shower. Baltas requested grievance and complaint forms, but Officers Allen and Clem allegedly denied him the forms and said, "Red Onion doesn't do grievances," and, "[W]e know how to deal with inmates like you." Baltas reported the denied meal tray to Sgt. Little and requested a grievance

form from him. Baltas claims that Sgt. Little denied him a grievance form and stated, "[W]e don't like that grievance shit here, you should keep that in mind." Baltas was subsequently provided a shower and given a razor to shave with, but he was not given a mirror and, consequently, cut himself several times. Baltas claims "[h]is legal documents were placed in his cell while he was in the shower." On December 25, 2019, Baltas wrote to CDOC Commissioner Cook regarding his property and his conditions of confinement in Virginia.

On December 26, 2019, at breakfast, Baltas "began a hunger strike seeking redress of his grievances," including his housing conditions, 24-hour cell lighting, "denial of access to the [tele]phone, denial of books and cleaning supplies, and staff's refusal to provide him access to the grievance process." Baltas also filed an emergency grievance. Defendant Nurses Anderson and Jessee were notified of Baltas's hunger strike and allegedly responded that they would "take no action . . . until he was at least five days in because he 'just wanted attention.'" Nurse Jessee also denied Baltas's emergency grievance. Baltas requested grievance forms and was denied.

On December 27, 2019, Baltas asked Officers Allen and Clem for outside recreation but his request was denied. Baltas claims the officers said he could not come out of his cell until he ate. Later, when defendant Sgt. Meade approached Baltas's cell, Baltas "attempted to request" recreation time and grievances. Sgt. Meade allegedly responded that he had "'heard all about' him and 'if [Baltas] came to Virginia with his writing everything up and filing lawsuits, [they would] get [him] out of the way.'" Baltas claims that when he asked what "get him out of the way" meant, Sgt. Meade said, "It means dead, son, dead!" Baltas alleges that Sgt. Meade "emphasized the threat" by telling Baltas that he had other "troublesome inmates 'moved out

of the way about 15 years ago' and [he had] gotten away with it," and that they "always get away with it."

On December 28, 2019, Baltas allegedly requested medical attention after feeling faint and having chest pains. Sgt. Meade responded and stated that Baltas would not receive medical treatment if he did not eat dinner and that Sgt. Meade would "ensure" that Baltas was "placed in the worst/most violent unit" at Red Onion. Baltas ate dinner and ceased his hunger strike after missing eight meals.

On December 30, 2019, Baltas contends defendant Officer A. Mullins made sexually harassing statements to him during an escort to or from recreation. While Baltas was on his knees to have restraints placed on his ankles, he claims that Officer A. Mullins stated that "since he was already on his knees, [Baltas] should provide him with oral sex."

Later that morning, while defendants Unit Manager ("UM") Miller and Assistant Warden ("AW") Fuller were touring the unit, they stopped to speak to Baltas. Baltas claims that he advised UM Miller and AW Fuller "of the various denials and deprivations and incidents he had endured" at Red Onion and AW Fuller allegedly responded, "[T]his is how Red Onion runs." When Baltas reported the threat made by Sgt. Meade and other staff conduct, UM Miller allegedly told Baltas to "'heed' [Sgt.] Meade and to 'not write anything up and respect staff and [he would] be okay here." Baltas states that he "understood this to be an instruction not to seek administrative remedies or th[ere] would be retaliation that these top administrators would sanction." Baltas claims that when he complained about being housed in a mental-health cell, AW Fuller and UM Miller stated that this was "their 'intake process to teach inmates their place at Red Onion.'"

On December 31, 2019, Nurse Anderson offered Baltas a tuberculosis test "which consist[ed] of the intrusive penetration of the skin with a needle." Baltas refused the test. Baltas states that "policies and regulations require" that he be placed on quarantine status after refusing the tuberculosis test because of the "risk he posed of infectious disease." Baltas also believes that VDOC officials "should have" sought to transfer him back to Connecticut upon his refusal.

Baltas alleges that, during his 16 days in the mental-health cell, Officers Allen and Clem and Sgts. Little and Meade denied him recreation for approximately nine days, repeatedly made him wait more than 72 hours between showers, denied him cleaning supplies, denied access to the telephone on all but one occasion, denied him access to the grievance process, forced him to live with waste in his cell daily, and denied him water daily.[5]

On January 3, 2020, UM Miller moved Baltas to a general-population cell "despite the risk of infectious disease" that Baltas posed after his refusal to be tested for tuberculosis. The general population housing unit was locked down at the time Baltas was moved in and staff was searching "every inch of the unit and cells extensively throughout the day." Baltas states that, even though "no weapons were found," the unit remained locked down after the search was complete.

Baltas describes the conditions of the general population housing unit as: lights being left on for 24 hours every day; modified exterior cell windows that make them "impossible to see out of" and "depriving" him of "visual stimuli"; four hours of out-of-cell recreation daily;

---

[5] The court understands this assertion to mean that Baltas did not have running water in the sink or toilet of his cell and not that he was not given fluids to drink each day.

all meals eaten in cells "within mere feet of a toilet"; "community" nail clippers; outside recreation twice a week for one hour at a time; gym recreation twice a week for one hour at a time; access to telephones daily; access to "kiosk and emails" daily; a television in the housing unit; access to weekly religious services; "extreme restrictions on movement"; weekly access to commissary with a $50 spending limit; "access to visits"; and permitted possession of property (including personal televisions). Baltas also claims that in the event of a use of force in the general population unit, "a mace grenade [is] discharged at all inmates." Baltas's cell was furnished with a desk, mirror, sink, toilet, bunk bed, and two large lights in the interior. His cell also had running water, but the cell was "filthy." Baltas requested cleaning supplies from Sgt. Little and defendant Officer Looney and they told him that he "ain't gettin nothing."

On January 6, 2020, Baltas was "classified" according to Red Onion and VDOC "policies and procedures." Baltas told UM Miller that he was "supposed to be managed" according to CDOC regulations and UM Miller advised Baltas that "[t]hat's not how we do things down here."

That same day, Baltas refused to sign the VDOC's mail policy authorizing staff to "seize, copy, and destroy his personal U.S. mail."[6] Baltas objected that VDOC Operating Procedures did not apply to him and asserted that he was entitled to receive his mail under Connecticut laws.[7]

---

[6] Baltas states that VDOC Operating Procedure 803.1 allows officials to "seize U.S. mail, photocopy it, then destroy the originals" and imposes a limit on the number of pages an inmate may receive.

[7] Baltas claims that Connecticut administrative procedures and laws allow inmates to receive an unlimited amount of mail and never authorize officials to seize or photocopy the mail unless it is identified as contraband.

That evening, Baltas wrote to CDOC Commissioner Cook "regarding the threats, incidents, and conditions being imposed" at Red Onion and he requested removal from Virginia. Baltas copied the letter to Director Clarke and the governors of Virginia and Connecticut.

On January 7, 2020, Baltas was offered another tuberculosis test, which he again refused. Baltas states he was willing to consent to an "alternative x-ray test," but would not consent to the needle test because it violated his "personal religious beliefs." Baltas claims he was never notified that refusing to have the tuberculosis test would result in a disciplinary infraction. After his second refusal of the tuberculosis test, Nurse Anderson charged Baltas with a disciplinary offense for "refusing to participate in preventative/prophylaxes therapies."

On January 8, 2020, Baltas's housing unit was taken off lockdown and inmates were allowed out of their cells together. Three days later, on January 11, 2020, a "secondary search" was conducted in the housing unit. Baltas claims that seven cells were targeted during the search and shanks were found in a "minimum of" three of those cells. Sgt. Meade was one of the supervisors conducting the search. Baltas claims that ,"[d]uring this time frame," unnamed corrections staff "solicited multiple inmates to attack [Baltas] with a weapon in exchange for favors and/or goods/drugs." Baltas alleges that Sgt. Meade provided a weapon to an inmate and solicited the inmate to attack Baltas after "falsely" telling the inmate that Baltas was a "rat" and "in V[irginia] on a protective custody status for 'ratting.'"

On January 13, 2020, a fight occurred in the housing unit and an inmate used a weapon to stab another inmate (not Baltas). During this incident, unnamed officers "wantonly fired mace cannisters into the unit, subjecting [Baltas] and all other uninvolved prisoners to mace"

and causing Baltas to suffer a "severe asthma attack." Baltas claims that, after this incident, UM Miller "prohibited staff from conducting another search" of the cells for weapons and AW Fuller and Warden Kiser "failed to order a search," which "allow[ed] weapons in the unit to go unfound."

On January 14, 2020, Baltas spoke with UM Miller regarding Baltas's management under the ICC and specifically raised his concerns about his need for access to unrecorded legal telephone calls, his mail, property, and food as "Connecticut law . . . mandated." Baltas complained to UM Miller that the menu at Red Onion was providing "approximately 2/3 [of] the minimum required portions for adult males as directed by OSHA and the American Corrections Association, that the food was unpalatable," that the food "often looked worse than dog food," and that there was "no variety." Baltas further explained that the CDOC menu "was far superior" and that he was entitled to "greater portion size[s]" under Connecticut law. Baltas claims that UM Miller told him that there "would be no 'special diet' for" Baltas. When Baltas requested access to the law library and access to the facility typewriter or typing services because "Conn[ecticut] law and court rules require documents to be typed," UM Miller told him that "no inmate goes to the law library and no inmate gets anything typed." UM Miller also allegedly and "sarcastically" asked if Baltas would like to have his "own secretary too?" Baltas claims that as he was walking away, UM Miller said that "he 'might have helped [Baltas] if [he] hadn't [] cried to the Director.'" That evening, Baltas wrote inmate requests to Warden Kiser and AW Fuller, complaining about the "deprivations" in food and his "need[s] of access to a typewriter" and an unrecorded telephone for him to speak with his attorney.

On January 15, 2020, Baltas attended a disciplinary hearing before defendant Disciplinary Hearing Officer ("DHO") L. Mullins regarding the disciplinary charge for refusing to take a tuberculosis test. At the hearing, Baltas explained that he had never taken the tuberculosis test in Connecticut and had received an alternative x-ray instead because "Conn[ecticut] law dictates [that] he has an absolute right to refuse any medical treatment free from adverse action." Nurse Anderson explained that the VDOC does not permit an alternative x-ray unless it is to "confirm or deny" a positive tuberculosis test and that disciplinary action is pursued when an inmate refuses the tuberculosis test because the "unacceptable risk an untested inmate poses to the gen[eral] pop[ulation]." DHO L. Mullins determined that Baltas was guilty of the disciplinary charge and penalized him with 60-days loss of good-conduct time. Baltas appealed, and Warden Kiser overturned the finding and "dismissed the charge."

On January 17, 2020, Baltas received notification from defendant Mail Officer Stanley stating that all of his "incoming social mail and publications would be disposed of until" he signed the inmate authorization form to allow VDOC officials to photocopy his mail. Baltas responded and explained that the VDOC's mail procedures do not apply to him because he was a Connecticut inmate.

On January 18, 2020, while Baltas was sitting at a table alone, "approximately three" inmates attacked Baltas from behind by stabbing him with an "8-inch ice pick like" weapon that "Sgt. Meade had provided to the third inmate." Baltas states he was stabbed approximately 8 to 12 times in the back and at least once in his left hand. During the attack, Baltas was also shot in the head and body with rubber bullets by an unnamed officer. Baltas claims that his

attackers were not shot by the rubber bullets. The attack ended when two other inmates came to Baltas's "aid." Correctional officers arrived thereafter and "forced" Baltas to lay down in the shower area. Baltas claims that he was "visibly bleeding and injured" and having him lay in the shower area posed "serious health risks to his open wounds." Baltas was placed in restraints and "forced" to walk to the medical unit. Medical staff determined that he would need to be treated at a hospital.

Baltas claims he was "forced to endure being placed in full restraints" and was transported by ambulance to the hospital. While he was in the hospital being assessed and treated, AW Fuller arrived to question Baltas about the incident. Baltas informed AW Fuller that he believed that corrections staff had set up the assault and AW Fuller allegedly "smirk[ed]" and stated, "[W]e wouldn't do something like that." Baltas informed AW Fuller that his restraints "were applied too tightly and were causing him severe pain [and] cutting into his flesh, and causing him to be unable to move or breathe appropriately." Baltas claims that AW Fuller stated that it was "too bad" and the restraints would remain on him as they had been applied. Baltas claims that AW Fuller subsequently ordered officers not to loosen the restraints.

Baltas alleges that a doctor treating him requested that the restraints be removed because they interfered with the doctor's ability to assess and treat Baltas. Baltas claims that AW Fuller stated that, pursuant to VDOC policy, the restraints would remain on at all times unless Baltas was to go in for surgery. The doctor said that the restraints might cause him to miss something which would create a need for surgery later and AW Fuller "simply shrugged his shoulders." Baltas tried, once again, to explain that VDOC policies did not apply to him.

Baltas's clothes were cut off him to allow for assessment and treatment, but AW Fuller still "would not allow [the] restraints [to be] removed." Due to internal bleeding, Baltas was admitted overnight at the hospital.

At approximately 11:00 pm, defendant Captain Franklin entered Baltas's hospital room. Baltas claims that Capt. Franklin "accept[ed] responsibility for the attack on behalf of the V[]DOC" and stated that they had "set it up and will set up another one." Baltas also alleges that Capt. Franklin threatened him that he should "keep [his] fucking mouth shut from now on" and there was "nowhere in Virginia [they couldn't] get [him]!"

On January 19, 2020, Baltas received stitches in his hand, was discharged, and returned to Red Onion. He states that, upon his return, he was placed in "used, old, dirty, soiled clothing and brought to [the] medical [unit]." After they removed his restraints, Baltas observed "severe swelling, bruising, and [painful] lacerations to his ankles, wrists, waist, and torso."

Baltas states he was placed in a medical observation cell with "nothing by an old dirty mattress and soiled linens." Despite him being "covered in blood," when he requested clean clothing and linens and a shower, Nurse Ball denied his request. The next day, Baltas was provided a shower, but still no clean clothing or linens.

On January 21, 2020, UM Miller informed him that he was being placed in the restrictive housing unit ("RHU") pending an investigation of the incident on the January 18th. Baltas's hand "had become severely infected" and "significant[ly]" painful, and it was "swelling and oozing discolored liquid." In addition, his "other wounds" were "also red and inflamed and painful." Nurse Ball examined Baltas and he reported "the infection and inflammation of his wounds and loss of movement in his hand." He also requested an inhaler for his asthma.

- 12 -

Nurse Ball ordered antibiotics for the infection and an x-ray for his hand but did not order an inhaler. During the examination, Nurse Anderson allegedly stated, "[W]e should have let him die!" Nurse Ball completed the medical examination and, "at Nurse Anderson's insistence," requested that Baltas take a tuberculosis test. Baltas refused in writing and noted that he would consent to an alternative x-ray test, but Nurses Ball and Anderson refused to provide one.

On January 22, 2020, Nurse Anderson informed Baltas that if he did not take the tuberculosis test, he would remain in the RHU and be issued another disciplinary charge. Baltas claims he was "forced to endure the intrusive penetration of a needle into his flesh under the threat of adverse action against him by [Nurse] Anderson." Baltas was moved from a medical cell to the RHU.

Baltas alleges that the conditions of confinement in the RHU included: complete isolation; confinement to the cell for 22 to 24 hours a day; deprivation of human contact; deprivation of ability to socialize; deprivation of access to schooling; deprivation of access to programs; deprivation of ability to exercise; deprivation of visual stimuli; outside recreation for one hour a day on five days a week while in a cage; a maximum of three showers per week; all movement out-of-cell in full restraints; deprivation of furnishings; deprivation of mirrors in the showers; "community" nail clippers; deprivation of storage containers for property; recycled air ventilation system; deprivation of warm meals; meals served in cells within feet of a dirty toilet; commissary restricted to a spending limit of $10; denial of access to information; visitation limited to non-contact visits; telephone access limited to twice weekly at random times; deprivation of possession of personal property; and 24-hour cell lighting. He also alleges that prison officials only viewed inmates every 40 minutes, "posing a very serious danger of

enabling self-harm or suicide." Baltas alleges that most of the conditions of the RHU are "not experienced by the rest of the [Red Onion] gen[eral] pop[ulation]." Baltas argues that these conditions "are being employed punitively and to harass and torture and are malicious and sadistically employed and intended to be so."

When Baltas entered the RHU cell, he noticed a "multitude of cuts and scratches on the cell door." Baltas "immediately notified" defendant Officer Looney and Officer Looney informed him that they were aware of it and that "all of the doors in here [are] like that." Baltas's request for cleaning supplies was denied. Baltas later asked defendant Lieutenant Lambert for cleaning supplies, clean clothing, and clean bed linens, but Lt. Lambert allegedly denied the request and told Baltas to wash his laundry "in the toilet."

On January 24, 2020, Sgt. Meade passed by Baltas's cell and allegedly stated, "I hope you done learned your lesson, cause [*sic*] if not we're ready." Baltas understood this to be a "threat of further attacks if he attempted to report any misconduct or pursue any more grievances."

On January 27, 2020, Baltas's Connecticut appellate court filings were returned to him for being handwritten.

That evening, an inmate in Baltas's housing unit set fire to the inmate's cell, causing an "enormous amount of smoke to fill the unit and cycle into the cells." Baltas claims that he suffered "severe respiratory problems," chest pains, and asthma attacks. Baltas states he was "forced to endure the smoke for a prolonged period of time" and had to "seal his vents and door and lay on the ground, trying to gasp for clean air." Baltas reported his condition to Capt. Franklin, who allegedly responded and denied Baltas medical aid stating, "[E]at shit and die."

- 14 -

A "short time later," the fan system was activated and cleared the smoke out of the housing unit. Baltas states that he "endured the smoke and its effects for over two hours."

On January 28, 2020, Baltas's property arrived at Red Onion from Connecticut. Baltas spoke with Warden Kiser and requested the processing of his property be expedited to provide him access to his personal typewriter because his Connecticut appellate court filings had been returned. Baltas also told AW Fuller and UM Miller that he needed access to a typewriter or typing services and the law library in order to litigate his numerous *pro se* matters. Baltas alleges that they would not allow him to possess a typewriter and "did not care for his arguments." Baltas also requested either access to a "non-recorded" telephone or, in the alternative, specific call times to use the recorded telephone so that he could call his attorneys, but his requests were denied.

On or about January 30, 2020, Baltas received a photocopy of outgoing legal mail that he had sent to a federal court in Virginia. Baltas claims that Officer Stanley had opened and inspected his mail with the "intent of investigating its contents for any information related to" Red Onion officials.

On the same day, Nurse Jessee examined Baltas's hand. He alleges that his hand was red, swollen, and oozing discolored fluid, but Nurse Jessee said it was "fine" and "refused" to provide any further treatment.

The next day, Baltas cut himself "significantly" while attempting to shave in the shower with an "old, dull razor" and without a mirror. Baltas claims that Lt. Lambert is responsible for ensuring that razors are exchanged but would only swap razors once a month. When Baltas

showed Lt. Lambert the cut on his head from shaving, Lt. Lambert allegedly laughed and asked if Baltas wanted "duct tape or toilet paper."

On or about February 2, 2020, Baltas became "violently sick" with a fever, headaches, weakness, and an "extreme and hacking cough that produced discolored [phlegm] and mucus and was constant." Baltas alleges that his illness "quickly spread" to the other three cells "interconnected" on his vent "due to the facility['s] vent[i]lation system."

On February 3, 2020, Warden Kiser placed Baltas on "Step Down 2" status, which is "supposed to be a status [for] inmates" who are soon going to be released from the RHU. Baltas states that Warden Kiser also informed him that the "investigation had concluded and that [Baltas's] request for all of his Conn[ecticut] property was 'kicked up to Richmond' and was being handled by Director Clarke, as was review of his status in V[irginia]."

On February 7, 2020, Baltas's property was processed by Sgt. Meade. Baltas received only his clothing, "cosmetics," and radio while the rest of his property was "restricted and deemed contraband" under VDOC operating procedures. Baltas's denied property included a typewriter, a television, a Nintendo 3DS with games, a hotpot, a tablet, a pillow, additional clothing, sneakers, books, and magazines. Baltas "immediately" wrote to Warden Kiser and requested his denied property, arguing that he was "entitled" to the property under Connecticut law and CDOC administrative procedures. Baltas also wrote a "separate request" to Warden Kiser requesting his television "in accordance with [Red Onion] policy," which allows televisions in "detention and segregation." Warden Kiser responded to these requests and advised Baltas that he would not receive his denied property while housed in the VDOC and that he would not receive his television while housed in the RHU. Thereafter, Baltas

attempted to use his radio and "discovered he could not receive any signal due to interefe[rence] from the interior cell light being on, thereby depriving him of the use of his property and access to information."

On February 10, 2020, Officer Stanley sent Baltas another notice stating that Baltas would only receive his legal mail until he agreed to the VDOC's mail photocopying policy.

On February 11, 2020, Baltas received approximately 13 books and magazines from his property. Baltas argues that his was a "very small portion of the 4 cubic feet" he is allowed to possess under CDOC administrative procedures.

After it "became apparent" that he would receive "no relief" from the VDOC, Baltas began preparing this action. He wrote to Warden Kiser, AW Fuller, and UM Miller, advising them that pursuant to Connecticut law and CDOC administrative procedures, he could not be kept in the RHU for more than 15 days and he requested release "or to be provided his property." He "raised issues related to his management and conditions" and advised them that he would "seek federal action." Baltas also wrote to Director Clarke and CDOC Commissioner Cook regarding his living conditions, "unending placement in isolation," and denial of property. Baltas requested his property, release from isolation, and return to Connecticut because of the "terror" he felt from the VDOC.

On February 18, 2020, Baltas spoke to Warden Kiser who informed him that he would not be released from RHU and would remain "as he was" indefinitely, until Warden Kiser was "ordered to release" him.

That same day, Baltas wrote to the medical staff, complaining that he had been sick for two weeks, was coughing up blood, and that the hair on his arms and body was "becoming dry and brittle and falling out."

On February 19, 2020, Baltas was escorted to UM Miller's office where Lt. Lambert was also present. These defendants "addressed" Baltas's correspondence and "made both indirect and direct threats" toward Baltas. Baltas claims they "made [it] very clear to" him that if he made any formal complaints, he "would not like the results." Baltas claims that while the "meeting" with UM Miller and Lt. Lambert was happening, defendant Officer Looney "and others" were searching his cell. When Baltas returned to his cell, he found it in "disarray" with property "thrown about the floor and destroyed" and his draft of this action was missing.

The next day, UM Miller and Lt. Lambert "fabricated a disciplinary charge" against him, stating that during the cell search, Lt. Lambert discovered "cut marks" on his cell door. According to Baltas, Officer Looney "falsely co[rr]oborated" that the cuts were new, even though Baltas had reported the cuts in the door to Officer Looney on the day he moved into the cell.

Baltas was later seen by Nurse Jessee "for his sickness," and she observed him cough up blood and phlegm but told him that "he'd be fine." Baltas became "verbally aggressive" and requested to see a doctor. Nurse Jessee ordered him cough syrup. Baltas alleges that a sergeant witnessed the interaction, "was appalled" by the treatment, and he filed a "complaint" about it to AW Fuller. Baltas states that AW Fuller ordered medical staff to conduct a chest x-ray to discover why Baltas was coughing up blood.

Baltas alleges that that even though no cutting tool was found in his cell, UM Miller, Lt. Lambert, and Capt. Franklin "implemented a policy" that Baltas's cell would be searched a minimum of once per shift and that Baltas was not allowed to exit his cell unless a supervisor was present. Baltas argues that this policy was "designed to harass and torment" Baltas.

On February 21, 2020, after a video hearing for a habeas corpus action in Connecticut, UM Miller and Lt. Lambert threatened Baltas and stated that they would not allow him to file any grievances or lawsuits because "Red Onion is Virginia's baby and [they were] not going to let [him] give Virginia's baby a black eye." They also told him that he could be "placed on a transport where anything can happen."

Later that day, Baltas was taken to the medical unit where he received chest and lung x-rays. The tests came back negative for any illness in his lungs and he was told that he "probably" had strep throat.

On February 24, 2020, UM Miller went to Baltas's cell and asked him if he was "planning on any write ups?" When Baltas responded that he was not, UM Miller allegedly said, "[G]ood, then we can get you out of here." Baltas was move to another cell.

On February 25, 2020, Baltas received legal mail from the federal court in Richmond that had been opened outside of his presence by Officer Stanley "and others," with the intent of investigating anything related to Red Onion. Baltas claims that "they" falsified records and said that the mail had arrived already opened.

On February 28, 2020, Baltas wrote to AW Fuller regarding his ongoing cough and the "complete refusal" by medical staff to provide him any treatment.

On February 29, 2020, the infection in Baltas's hand had spread up his forearm causing inflammation and swelling, discolored orange liquid coming from the wound, and extreme pain. A nurse observed this, became "extremely concerned," and told him to write to medical staff immediately. Baltas informed her that medical staff refused to provide him any treatment, and she told him that she would "make sure [he is] seen." On March 1, 2020, Baltas wrote to the medical unit about the infection.

On March 2, 2020, Officer Milgram conducted a search of Baltas's cell during which Officer Milgram allegedly used "vulgar language" towards Baltas, destroyed Baltas's personal property, and threatened Baltas by saying he was "going to break [his] ass."

On March 4, 2020, Nurse Jesse saw Baltas and referred him to the doctor for his "extreme infection." When Baltas told her that she had "known about this for months," she allegedly replied, "You're lucky this was already documented, or I'd let it kill you."

On March 5, 2020, Baltas appeared before DHO L. Mullins for his disciplinary hearing on the cut door charges allegedly "fabricated" by Lt. Lambert and UM Miller. Baltas states that DHO L. Mullins refused to review any of the evidence Baltas had requested, including a video "that would prove" that the report was fabricated. Baltas claims that Lt. Lambert falsely testified that Officer Looney was a witness to the cuts on the door and Officer Looney "did not deny the untruths." Baltas contends that he "refuted the charges," but DHO L. Mullins nevertheless determined that he was guilty and imposed a penalty of 60-days' loss of telephone privileges. UM Miller subsequently approved DHO L. Mullins' determination and the penalty imposed. Baltas argues that he was "left with no ability to communicate or associate with anyone" and was "denied any ability to call his attorneys."

On March 13, 2020, Nurse Ball saw Baltas for his hand infection and ordered an antibiotic and antibiotic ointment. Baltas expressed concern over the hair falling out of his arms and Nurse Ball said that it was dry skin and ordered an ointment for it. Around that same time, approximately 35 days after it began, Baltas's "sickness subsided."

On March 14, 2020, UM Miller charged Baltas with a disciplinary offense for "writing a vulgarity" about UM Miller on a table. Baltas claims that UM Miller discovered this by watching a video of the RHU. Later, Sgt. Little searched Baltas's cell and "destroyed [Baltas's] property and threw all of his possessions on the floor." Baltas claims that Sgt. Little stated, "Sorry, [UM] Miller said I had to[]."

On or about March 19, 2020, Director Clarke and Warden Kiser issued memos regarding the COVID-19 pandemic. In the memos, all visits were canceled indefinitely, inmates were instructed to bathe and wash their hands regularly, and all telephone restrictions were lifted.

On or about March 20, 2020, the inmates who had attacked Baltas on January 18 and those who had been found in possession of weapons on January 11, were placed on the RHU release list and returned to general population. Baltas remained in the RHU.

On March 21, 2020, Officer Milgram allegedly told Baltas that he intended to "rape his shit hole."

On March 23, 2020, Baltas was placed in "Step Down 1" status which he claims is a general population assignment. However, Baltas remained in the RHU and was denied all general population "privileges and rights."

On or about March 24, 2020, Baltas's telephone deposit form was denied due to "insufficient funds," even though Baltas claims that he had "sufficient funds in his account." When Baltas asked staff about the denial, they told him that UM Miller "ordered [them] not to process [the tele]phone request because he's pissed [that Baltas's tele]phone got turned back on."

On or about March 28, 2020, after approximately 65 days, the infection in Baltas's hand "subsided" and his wound closed. Baltas states he still has not regained complete mobility in his left hand, and he "fears" the damage, caused by the "lack of medical care he received," is permanent.

Baltas alleges that he remained housed in isolation under "extremely harsh [] and atypical and significant conditions not experienced by the rest of" the Red Onion inmates housed in the general population for over 69 days, without any type of hearing regarding his housing or classification.

Baltas claims that while he has been housed at Red Onion, he has never been provided cleaning supplies. While housed in the RHU, defendants Sgt. Little, Officer Looney, Officer A. Mullins, Lt. Lambert, and UM Miller denied him cleaning supplies, "new clean clothing and linens," and regular outside recreation and access to showers. In addition, Officers Looney and A. Mullins have denied him approximately seven meals "without cause," in order to "torment and harass him."

During his incarceration in Virginia, Baltas has received "no social visits due to travel distance and no legal visits, depriving him of access to counsel." He claims that he has also been denied communications and private communications with his counsel because he is

"forced" to make all telephone calls on recorded telephone lines at "odd times." He also claims that he has been deprived of adequate nutrition and he has lost approximately 45 pounds.[8]

On or about April 28, 2020, Baltas received a notice from the CDOC stating that all the mail they had sent to him had been returned to them and that they had various documents they needed to send to him, including grievances, "FOI materials," and "state property claims." Baltas wrote to AW Fuller, Warden Kiser, and Director Clarke about being denied access and communications with the CDOC and they "expressly refused to cure this." Baltas claims that, "since being housed in" Virginia, Officer Stanley has "improperly returned all" of Baltas's incoming correspondence to the senders and "falsely" wrote that Baltas did "not want to receive [their] mail" or had "rejected [their] mail." Baltas argues that Officer Stanley "effectively destroyed" his personal relationships with "friends, family, and associates" "beyond repair." Baltas also alleges that Officer Stanley improperly returned his legal mail from various sources, including "legal/privileged mail from government agencies, bar associations, and courts, and various attorneys." In support of this assertion, Baltas provides copies of two envelopes that his attorney sent to him at Red Onion which were returned to the attorney.[9] Baltas also complains that Officer Stanley and the VDOC provided Baltas "no notice of any kind" when they "return[ed] or reject[ed]" his mail. Baltas wrote to AW Fuller, Warden Kiser, Director Clarke, and CDOC Commissioner Cook about his lack of access to

---

[8] Baltas claims that upon his arrival at Red Onion on December 20, 2019, he weighed "260 plus pounds," on January 19, 2020, he weighed 248 pounds, and on March 13, 2020, he weighed 218 pounds.

[9] The court notes that there are no markings on the envelope to indicate that the sender was an attorney.

legal mail and courts, and he claims that "they responded" by denying the occurrences and "refus[ing] to cure" the issue.

Baltas states that since the January 2020 attack on him, he has been housed in the RHU in solitary confinement without "due process of any kind." Baltas claims that the other inmates in the RHU are there based on disciplinary action. He also claims that he has not been "seen or reviewed by mental health staff" since the attack, he has been unable to practice his religion, and has no access to group religious services. Baltas alleges that Warden Kiser, UM Miller, and Director Clarke have "expressly admitted that [Baltas] has been kept in [the] RHU because he cannot be safely housed anywhere in V[irginia] and they cannot guarantee his safety anywhere in V[irginia]." Baltas also claims that since May 2020, Warden Kiser, AW Fuller, and UM Miller "refused to allow any outside recreation" for inmates housed in the RHU. As a result of his confinement in the RHU, Baltas alleges that he has experienced "extreme depression, despair, anxiety, stress, manic [episodes], and complete deterioration of his mental and emotional health and facilities."

Baltas alleges that since filing this action, Lt. Lambert, UM Miller, Capt. Franklin, and "other" VDOC officials have "retaliated against him by threatening him with physical violence, threatening to arrange future attacks," spreading the "false rumor" among inmates that Baltas is a "snitch" and pressed criminal charges against his attackers, and soliciting "inmates and gang members to assault and stab" Baltas "in exchange for preferential treatments and payments." Baltas alleges he has also been threatened with future violence by inmates at Red Onion and by inmates transferring from other facilities. Baltas states that these inmates have "informed him there is an outstanding 'hit' contract out on him" within all

VDOC facilities and "amongst several gangs." Baltas believes that inmates are "l[]ying in wait

throughout the V[]DOC, with plans to violently assault and/or kill" Baltas. Baltas claims that

he has reported these threats to CDOC Commissioner Cook and Director Clarke and they

"continue to do nothing."

Baltas identifies the following claims:[10]

1.  Defendants Director Clarke and CDOC Commissioner Cook[11] transferred Baltas
    from Connecticut to Virginia in retaliation for his civil actions filed in Connecticut
    courts;[12]

2.  Defendants Officers Allen, Clem, and A. Mullins, and Sgts. Little and Meade, and
    Nurse Jessee subjected him to cruel and unusual living conditions by housing him
    in the mental-health cell;

3.  Defendants retaliated against him by threatening him, filing false reports against
    him, denying his "rights and privileges," harassing him, torturing him, and
    "orchestrating and/or facilitating" an attack against him;

4.  Defendants Director Clarke, CDOC Commissioner Cook, AW Fuller, and UM
    Miller failed to protect him from an attack by other inmates;

5.  Defendants AW Fuller and Nurses Anderson, Jessee, and Ball denied him adequate
    medical treatment;

6.  Defendants Nurses Anderson and Ball forced him to undergo a tuberculosis test;

7.  Defendants subjected him to cruel and unusual living conditions without due
    process when they housed him in the RHU;

8.  Defendants denied him due process at a disciplinary hearing when they filed "false
    or faulty" charges against him and applied VDOC Operating Procedures instead of
    Connecticut law and administrative procedures;

---

[10] The court uses the same numbering of claims that Baltas and the defendants used in their filings.

[11] CDOC Commissioner Cook has not yet been served in this matter and, thus, has not yet responded to
Baltas's amended complaint.

[12] The court notes that this same claim is pending against CDOC Commissioner Cook in the United States
District Court for the District of Connecticut. *See Baltas v. Maiga, et al.*, Civil Action No. 3:20cv1177 (D. Conn.
Aug. 13, 2020).

9.  Defendants Officers A. Mullins and Milgrim sexually harassed him;

10. Defendants provided him with food that was nutritionally inadequate, unpalatable, and lacking in variety, causing him to "suffer[] malnourishment";

11. Defendants denied him association and communication with friends and family;

12. Defendants denied him access to courts and counsel by denying him access to a "law library and its resources," a personal typewriter, the grievance process, and "unrecorded and private" communication with counsel and by transferring him to Virginia "where he cannot meet with counsel" in person;

13. Defendant Officer Stanley denied him social correspondence, publications, newspapers, and magazine and opened legal mail outside his presence;

14. Defendants subjected him to cruel and unusual living conditions;

15. Defendants subjected him to 24-hour cell lighting;

16. Defendants implemented, enforced, or observed "unconstitutional customs, practices, policies, and/or procedures," including solitary confinement, an "inadequate menu," denial of access to a law library, "operation of the RHU," "abuses of staff," "community nail clippers," in-cell feeding, a "blanket use of force policy," and a "blanket mail policy";

17. Defendants subjected him to cruel and unusual living conditions by housing him in "RHU/solitary/isolation confinement" for "extended periods of time";

18. Defendants violated the ICC and Connecticut laws and administrative procedures and denied him due process by treating him differently than other Connecticut inmates;

19. Defendants "seized and withheld" Baltas's personal property without cause or due process;

20. Defendants waived qualified immunity by entering the ICC;[13]

21. Defendants UM Miller, AW Fuller, Kiser, Director Clarke, and CDOC Commissioner Cook housed Baltas in solitary confinement without due process;

---

[13] Although designated as a claim in Baltas's amended complaint, the court notes this is not a legal claim for relief, but rather a legal argument in opposition to a defense Baltas's apparently anticipates the defendants would raise. As such, the court will not analyze "Claim 20" in its discussion of Baltas's claims.

22. Defendants Officer Stanley, AW Fuller, Director Clarke, and CDOC Commissioner Cook denied his right to association and destroyed his personal relationships by failing to provide him "notice or due process when they return[ed] his mail";

23. Defendants Officer Stanley, AW Fuller, Warden Kiser, Director Clarke, and CDOC Commissioner Cook denied him access to counsel, courts, state agencies, and the CDOC;

24. Defendants Lt. Lambert, UM Miller, and Capt. Franklin retaliated against him for filing this action by threatening him, spreading false rumors about him, "slandering him," and "actively orchestrating and soliciting acts of violence against him";

25. Defendants subjected him to cruel and unusual living conditions by confining him in Virginia, denying him access to courts and counsel in Connecticut, and by denying him a speedy trial in Connecticut; and

26. "[A]ny and all claims, causes, and arguments not specifically and/or artfully raised" in his amended complaint.

The defendants have moved to dismiss Baltas's amended complaint, arguing that his identified claims either do not adequately allege personal involvement of a defendant or they fail to state a claim upon which relief may be granted. Baltas responded to the motions to dismiss of defendants Nurses Jessee, Ball, and Anderson, but did not respond to the other defendants' motion.

## II.

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94

(2007). Legal conclusions in the guise of factual allegations, however, are not entitled to a presumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and quotations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level," *id.*, with all the allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005). Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. In order to allow for the development of a potentially meritorious claim, federal courts have an obligation to construe *pro se* pleadings liberally. *See, e.g., Boag v. MacDougall*, 454 U.S. 364, 365 (1982). Moreover, "[l]iberal construction of the pleadings is particularly appropriate where . . . there is a *pro se* complaint raising civil rights issues." *Smith v. Smith*, 589 F.3d 736, 738 (4th Cir. 2009). Nevertheless, "[p]rinciples requiring generous construction of *pro se* complaints are not . . . without limits." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). "A *pro*

*se* plaintiff still must allege facts that state a cause of action." *Bracey v. Buchanan*, 55 F. Supp. 2d 416, 421 (E.D. Va. 1999).

## III.

At the outset, the court notes that many of Baltas's issues with his confinement in Virginia arise from his mistaken understanding that he is not subject to the policies and regulations of the VDOC. This is plainly wrong. Pursuant to the ICC provided by Baltas as an exhibit to his complaint, while in the custody of the VDOC, Baltas is "subject to all the provisions of law and regulations" applicable to other inmates in Virginia. It is unclear where Baltas's mistaken understanding comes from, but he provides no evidence or legal rationale to support his assertions that he is subject to different prison policies and procedures than other Virginia inmates housed in Virginia. To the extent that Baltas alleges that the defendants have violated his rights under CDOC administrative procedures, the court finds no factual or legal basis for his claims.

### A. Allegations against defendants collectively

To state a cause of action under § 1983, a plaintiff must allege facts indicating that he has been deprived of rights guaranteed by the Constitution or laws of the United States, and that this deprivation resulted from conduct committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42 (1988). Liability under § 1983 is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (internal citation omitted). Thus, a § 1983 claim requires factual detail about each defendant's personal involvement. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)) (explaining that liability will lie under § 1983 only

"where it is affirmatively shown that the official charged acted personally" in the violation of plaintiff's rights and affirming dismissal of claim where plaintiff did not allege personal involvement by defendant). When a plaintiff uses a collective term such as "defendants" to identify purported wrongdoers, his complaint is facially deficient. *See, e.g., Breyan v. Mental Health*, No. 2:17cv665, 2017 U.S. Dist. LEXIS 58906, at *5-6, 2017 WL 1380647, at *2 (D.S.C. Mar. 24, 2017) (summarily dismissing claims against "mental health" or "medical staff" and holding that the plaintiff "must identify the person or persons who purportedly violated his rights."); *Roberson v. Thomas*, No. 2:11-3114, 2012 U.S. Dist. LEXIS 31667, at *4, 2012 WL 786275, at *2 (D.S.C. Feb. 16, 2012) (dismissing claims against a collection of "defendants"). A "[p]laintiff's general allegation that unspecified defendants and/or an entire 'department' violated his rights is conclusory and does not adequately state a § 1983 claim." *Breyan*, 2017 U.S. Dist. LEXIS 58906, at *6, 2017 WL 1380647, at *2. In *Roberson*, the inmate plaintiff named several individuals as defendants, but then used the collective term "defendants" to claim that "he is being or has been subjected to cruel and unusual punishment." *Roberson*, 2012 U.S. Dist. LEXIS 31667, at *4, 2012 WL 786275, at *2. The court found this to be insufficient and dismissed the claims as frivolous. *Id.,* 2012 U.S. Dist. LEXIS 31667, at *8, 2012 WL 786275, at *3.

While some of the factual allegations in Baltas's amended complaint allege serious instances of misconduct, many of his claims fail to identify which defendant is actually liable for what violations of the law. In Claims 3, 7, 8, 10, 11, 12, 14, 15, 16, 17, 18, 19, and 25, Baltas simply claims that "defendants" or "the defendants" or "all named defendants" violated his rights. Without stating which defendants individually are responsible for which violations of

specific provisions of law, Baltas's amended complaint is plainly insufficient. *Iqbal*, 556 U.S. at 676 (A plaintiff must plead that each "defendant, though the official's own actions, has violated the Constitution.") Accordingly, the court will grant defendants' motion to dismiss these claims.[14]

## B. Claim 1–Retaliatory transfer

In Claim 1, Baltas alleges that defendants Director Clarke and CDOC Commissioner Cook transferred him from Connecticut to Virginia "in retaliation for his civil actions and to interfere with his" ongoing litigation in Connecticut. Generally, to state an adequate claim for First Amendment retaliation, an inmate must plead more than "naked allegations of reprisal . . . ." *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994). Specifically, Baltas must show: (1) that he engaged in constitutionally-protected conduct; (2) that a defendant took some action that adversely affected his First Amendment rights; and (3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct. *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017). Courts have held that a plaintiff may suffer an "adverse action" if the defendant's "allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of [the protected] rights." *Constantine v. Rectors & Visitors of George Mason Unit.*, 411 F.3d 474, 500 (4th Cir. 2005). "This objective inquiry examines the specific facts of each case, taking into account the actors involved and their relationship." *Thompson v. Clarke*,

---

[14] The non-medical defendants also argue in their motion to dismiss that Baltas has failed to identify a specific defendant in Claims 2, 4, and 5. However, in enumerating his claims on pages 61 to 83 of his amended complaint, he clearly alleges that Claim 2 is against defendants Officer Allen, Officer Clem, Sgt. Little, Sgt. Meade, Officer A. Mullins, and Nurse Jessee, Claim 4 is against defendants Director Clarke, CDOC Commissioner Cook, AW Fuller, and UM Miller, and Claim 5 is against defendant AW Fuller (he also alleges that Claim 5 is against Nurses Anderson Jessee, and Ball, but they all address the merits of this claim in their own motions to dismiss). Accordingly, the court will deny defendants' motion to dismiss Claims 2, 4, and 5 against the non-medical defendants.

No. 7:17cv111, 2018 U.S. Dist. LEXIS 172258, at *4, 2018 WL 4855457, at *2 (W.D. Va. Oct. 5, 2018) (quoting *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006)).

### 1. Director Clarke

Baltas claims that VDOC Director Clarke retaliated against him for filing litigation in Connecticut by transferring him to Virginia from Connecticut. However, nowhere in his factual allegations does Baltas ever allege what role Director Clarke played in the decision to transfer Baltas to Virginia. More importantly, he fails to allege any facts to show that Director Clarke knew about Baltas's pending lawsuits before the transfer decision was made. Here, Baltas's allegation that Director Clarke transferred him in retaliation for lawsuits filed in another state is devoid of any factual support.

Regarding the alleged retaliatory transfer, Baltas's aole allegations are that Director Clarke is the Director of VDOC and that, at some time prior to December 20, 2019, Director Clarke and CDOC Commissioner Cook entered into a contract to facilitate an inmate exchange pursuant to the ICC. Baltas alleges that he was "expressly told by both [C]DOC [] and V[]DOC officials that he was transferred to V[irginia] as a result of his litigation against [C]DOC and to hinder said litigation." These allegations regarding Baltas's transfer to Virginia fail to allege any facts supporting Director Clarke's involvement, Director Clarke's prior knowledge about Baltas's pending litigation, or any retaliatory motive whatsoever. Accordingly, the court concludes that Baltas's allegations fail to state a cognizable retaliation claim against Director Clarke fails and, therefore, the court will grant defendants' motion to dismiss this claim.

## 2.  CDOC Commissioner Cook

Baltas claims that CDOC Commissioner Cook retaliated against him for filing litigation in Connecticut by transferring him to Virginia from Connecticut. Filing a lawsuit is protected First Amendment activity. *See DeShazor v. Barb*, No. PX-19-1123, 2020 U.S. Dist. LEXIS 163912, at *11, 2020 WL 5407767 (D. Md. Sep. 8, 2020). Based on Baltas's allegations against CDOC Commissioner Cook, it is plausible that Baltas's transfer could be considered adverse action. Further, his allegations could raise an inference of a causal connection between his litigation and the interstate transfer. Therefore, the court concludes that Baltas's allegations state a viable claim for relief against CDOC Commissioner Cook and the court will grant Baltas's motion to serve CDOC Commissioner Cook (ECF No. 39) and require Cook to respond to Baltas's allegations.

### C. Claim 2–Conditions of confinement in the mental-health cell

Baltas claims that defendant Officers Allen, Clem, and A. Mullins, Sgts. Little and Meade, and Nurse Jessee subjected him to cruel and unusual living conditions by housing him in the mental-health cell. The court concludes that Baltas's allegations against Nurse Jessee fail to state a viable claim for relief. The remaining defendants to this claim did not address the merits of Baltas's allegations in their motion to dismiss and, therefore, to the extent they seek dismissal of this claim, the court will deny their motion.

With regard to the named defendants and his 16 days in the mental-health cell, Baltas alleges that on December 23, 2019, Officers Allen and Clem denied him a shower and change of clothes and Sgt. Little denied him recreation, a shower, a change of clothes, and use of a telephone. On another day, Officers Allen and Clem denied him a meal and grievance forms.

Baltas claims that officers later provided him a shower but refused him a mirror for shaving. On December 26, 2019, Baltas began a hunger strike "seeking redress of his grievances," including his housing conditions, 24-hour cell lighting, "denial of access to the [tele]phone, denial of books and cleaning supplies, and staff's refusal to provide him access to the grievance process." Baltas claims that Nurse Jessee's response to his hunger strike was to "take no action" until he was "at least five days in." On December 27, 2019, Officers Allen and Clem denied him recreation. On the same day, Sgt. Meade threatened him about filing lawsuits. On December 28, 2019, Sgt. Meade said Baltas could not get medical treatment unless he started eating. In response, Baltas ended his hunger strike. On December 30, 2019, Officer A. Mullins sexually harassed him. In sum, Baltas alleges that during his 16 days in the mental-health cell, Officers Allen and Clem and Sgts. Little and Meade denied him recreation for approximately nine days, made him wait more than 72 hours between showers on ten days, denied him cleaning supplies, denied him access to the telephone on all but one occasion, denied him access to the grievance process, forced him to live with waste in his cell daily, and denied him running water in his cell daily.

To the extent Baltas is attempting to raise a living-conditions claim against Nurse Jessee based on the allegation that she decided to take no action concerning Baltas's hunger strike until he was at least five days into it, the court concludes that he has failed to state a cognizable claim against her. The Eighth Amendment protects prisoners from cruel and unusual living conditions. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To sustain a living-conditions claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused the denial of "the minimal civilized measure of life's

necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish the first element, the prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). To establish the second element of deliberate indifference, a plaintiff must show that the defendant was personally aware of facts indicating a substantial risk of serious harm and that the defendant must have actually recognized the existence of such a risk. *See, e.g., Farmer*, 511 U.S. at 838-40; *Conner v. Donnelly*, 42 F.3d 220, 222 (4th Cir. 1994). The plaintiff also must show that the defendant subjectively recognized that his actions were inappropriate in light of that risk. *Parrish v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (citation omitted). Baltas has failed to allege facts against Nurse Jessee that would show that her failure to intervene in his hunger strike caused him "significant physical or emotional harm, or a grave risk of such harm." Moreover, he has not alleged that Nurse Jessee was actually aware of any potential risk of harm. Accordingly, Baltas's allegation against Nurse Jessee is insufficient to state a viable living-conditions claim.

None of the non-medical defendants addressed the merits of this claim in their motion to dismiss, so the court will not address its merits.[15] Insofar as the non-medical defendants sought the dismissal of Claim 2, their motion to dismiss will be denied.

### D. Claim 4–Failure to protect

In Claim 4, Baltas alleges defendants Director Clarke, CDOC Commissioner Cook, AW Fuller, and UM Miller failed to protect him from an attack by other inmates. The court

---

[15] Instead, the non-medical defendants argue that Baltas failed to identify a defendant related to this claim.

will only address this claim as to CDOC Commissioner Cook as the other defendants did not address this claim in their motion to dismiss. *See supra* n.14. In support of this claim, Baltas alleges that on December 27, 2019, while Baltas was housed in a segregation cell, Sgt. Meade threatened him that, if he filed grievances or lawsuits, he would "get him out of the away." When Baltas asked what that meant, Sgt. Meade responded that it meant "dead." Three days later, while Baltas was still housed in the segregation cell, Baltas reported Sgt. Meade's threat to UM Miller and AW Fuller. On January 3, 2020, Baltas was moved to a general-population cell. On January 6, 2020, Baltas wrote to CDOC Commissioner Cook and copied Director Clarke and reported, among other things, Sgt. Meade's threat. On January 13, 2020, while still housed in the general-population cell, a fight occurred between two other inmates and involved a weapon. After the incident, UM Miller "prohibited" staff from conducting a search for more weapons and AW Fuller "failed to order a search," which Baltas believes "allow[ed] weapons in the unit to go unfound." On January 18, 2020, while housed in the general-population cell, Baltas was attacked by three other inmates, one of whom had a weapon that Baltas alleges was supplied by Sgt. Meade. Baltas argues that Director Clarke, CDOC Commissioner Cook, AW Fuller, and UM Miller were "on notice" that weapons remained in the housing unit and did not conduct a search "to secure inmate safety."

"[P]rison officials have a duty. . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (quotation marks and citation omitted). A prisoner who alleges deliberate indifference under the Eighth Amendment arising from failure to protect must satisfy two requirements, an objective component and a subjective component. "First, the deprivation alleged must be, objectively, sufficiently serious" (objective

component), and second, "the prison official must have a sufficiently culpable state of mind" (subjective component). *Id.* at 834 (quotation marks and citation omitted). To satisfy the objective component, a prisoner must establish an "extreme deprivation," *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003), which requires the prisoner to "allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003).  To establish the subjective component, a prisoner must show that the prison official acted with "deliberate indifference," which entails "something more than mere negligence," but "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 834–35. Deliberate indifference "requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm." *De'Lonta*, 330 F.3d at 634. A prison official acts with deliberate indifference if he has "actual knowledge that an inmate faces substantial risk of serious harm and disregards the risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 835. The test is not "whether an official knew or should have known of the possibility of harm, but whether he did, in fact, know of it and consciously disregard[ed] that risk." *Id.* The official must be aware of facts from which "the inference could be drawn that a substantial risk of serious harm exists," and he must also "draw the inference." *Id.* at 837. A plaintiff asserting a failure-to-protect claim must show that the officer knows about the violation of plaintiff's person and that he has a reasonable opportunity to prevent the harm, but he chooses not to act. *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002); *Young v. Va. Dep't of Corr.*, No.

7:11-cv-213, 2011 U.S. Dist. LEXIS 58578, 2011 WL 2140434, at *2 (W.D. Va. May, 31, 2011) (dismissing claim where no allegation that "any official could have intervened . . . in time to prevent the injury").

Baltas's allegations are insufficient to show that CDOC Commissioner Cook was deliberately indifferent to the risk of Baltas being attacked by other inmates. The only potential evidence alleged by Baltas to suggest that he may be attacked by other inmates in the future was Sgt. Meade's threat to "get him out of the way" if he filed grievances or lawsuits. Sgt. Meade allegedly made this threat against Baltas while he was housed in a segregation cell. Baltas reported Sgt. Meade's threat to CDOC Commissioner Cook in a letter that was sent on January 6, 2020, after Baltas had been moved to a general-population cell. It is unknown whether CDOC Commissioner Cook actually received the letter before the attack occurred on January 18, 2020, but even if he had, there is still no allegation that he actually drew an inference between Sgt. Meade's alleged threat and the existence of a "substantial risk of serious harm."[16] Accordingly, the court cannot find that Baltas's allegations show that CDOC Commissioner Cook failed to protect him and, therefore, the court will dismiss this claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

---

[16] As part of his failure-to-protect claim, Baltas also alleges that after a fight between two other inmates involving a weapon occurred in his housing unit, UM Miller "prohibited" a search of the housing unit for more weapons and AW Fuller "failed to order" a search. However, there is no allegation that CDOC Commissioner Cook was aware of the fight, knew that the housing unit was not searched, or had any reason to suspect that any weapons existed in Baltas's housing unit. Without an allegation that that he actually drew an inference between the failure to search the housing unit and the existence of a "substantial risk of serious harm," there is no cognizable failure to protect claim against CDOC Commissioner Cook.

### E. Claims 5 and 6–Medical claims

In Claims 5 and 6, Baltas alleges that AW Fuller and Nurses Anderson, Jessee, and Ball were deliberately indifferent to his serious medical needs. The court will only address these claims as to the medical defendants because AW Fuller did not address the merits of this claim in his motion to dismiss. *See supra* n.14. In support of these claims, Baltas argues that Nurses Anderson, Jessee, and Ball "refuse[d] to treat him" and subject[ed] him to excessive and extreme risks and undue harm." He also alleges that Nurses Anderson and Ball "force[d]" him to "undergo the intrusive procedure of" a tuberculosis test "that breaches the flesh" and that was done under the "threat of adverse action."

To state a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must allege facts sufficient to demonstrate that a defendant was deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Conner v. Donnelly*, 42 F.3d 220, 222 (4th Cir. 1994); *Staples v. Va. Dep't of Corr.*, 904 F. Supp. 487, 492 (E.D. Va. 1995). A prison official is "deliberately indifferent" only if he or she "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. A claim concerning a disagreement between an inmate and medical staff regarding diagnosis or course of treatment does not implicate the Eighth Amendment. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Harris v. Murray*, 761 F. Supp. 409, 414 (E.D. Va. 1990). In fact, "many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). An "error of judgment" on the part of prison medical staff or "inadvertent failure to provide adequate medical care," while perhaps sufficient to support an action for malpractice, does

not constitute a constitutional deprivation redressable under § 1983. *Boyce v. Alizaduh*, 595 F.2d 948, 953 (4th Cir. 1979), *abrogated on other grounds by Neitzke v. Williams*, 490 U.S. 319 (1989). Mere negligence does not constitute deliberate indifference; rather, a prison official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists and must draw the inference. *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998); *see also Farmer*, 511 U.S. at 837. The prison official's conduct must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Militier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

Claims of inadequate medical care under the Eighth Amendment against a non-medical prison official require facts showing that the defendant was personally involved a denial of treatment, or tacitly authorized or was indifferent to the medical provider's misconduct. *Miltier*, 896 F.2d at 854; *Smith v. Barry*, 985 F.2d 180, 184 (4th Cir. 1993); *Lewis v. Angelone*, 926 F.Supp. 69, 73 (W.D. Va. 1996).

## 1. Medical treatment

Baltas claims that Nurses Jessee, Anderson, and Ball denied him adequate medical treatment. In support of his claims against these defendants, Baltas alleges that on December 21, 2019, after Baltas began a hunger strike, Nurse Anderson and Jessee responded by deciding to take no action under he was "at least five days in." A month later—and two days after returning from treatment in the hospital—Nurse Ball examined Baltas's infected and painful hand on January 21, 2020, and ordered antibiotics and an x-ray for it. Baltas also requested an inhaler, but she did not order one for him. Nine days later, Nurse Jessee examined Baltas's

hand and determined that it was "fine," even though Baltas claims that it was red, swollen, and "oozing discolored fluid."

In early February, Baltas became "violently sick" with a fever, headaches, weakness, and an "extreme and hacking cough that produced discolored [phlegm] and mucus and was constant." Nurse Jessee examined him on February 20, 2020, and observed him coughing up blood and phlegm but told him that "he'd be fine." After Baltas became "verbally aggressive" and requested to see a doctor, Nurse Jessee ordered him cough syrup. AW Fuller subsequently ordered medical staff to conduct a chest x-ray to discover why Baltas was coughing up blood. The next day, Baltas was taken to the medical unit where he received chest and lung x-rays. The tests came back negative for any illness in his lungs and he was told that he "probably" had strep throat. Nurse Jessee examined Baltas again on March 4, 2020, and referred him to the doctor for his "extreme infection." When Baltas told her that she had "known about this for months," she allegedly replied, "You're lucky this was already documented, or I'd let it kill you." Approximately nine days later, Baltas's "sickness subsided."

Nurse Ball evaluated Baltas's hand again on March 13, 2020, and ordered an antibiotic and antibiotic ointment. When Baltas expressed further concern about the hair falling out of his arm, Nurse Ball also ordered an ointment for that. Approximately 15 days after his last appointment with Nurse Ball, Baltas's hand infection "subsided" and his wound closed.

Baltas's allegations are insufficient to show that Nurses Anderson, Jessee, or Ball were deliberately indifferent to any of his serious medical needs. The nurses examined him upon his requests and provided him with medication, x-rays, and referrals to the doctor when they deemed them appropriate. Though Baltas may disagree with the treatment he received, such a

disagreement does not rise to the level of a constitutional violation.[17] Accordingly, the court will grant defendants' motions to dismiss these claims.

### 2. Tuberculosis testing

Baltas alleges that Nurses Anderson and Ball "forced" him to undergo a tuberculosis test. In support of his claim, Baltas alleges that on December 31, 2019, Nurse Anderson offered Baltas a tuberculosis test, Baltas refused. On January 7, 2020, Baltas was offered another tuberculosis test, which he again refused. Baltas states that he was willing to consent to an "alternative x-ray test," but would not consent to the needle test because it violated his "personal religious beliefs." After his second refusal of the tuberculosis test, Nurse Anderson charged Baltas with a disciplinary offense for "refusing to participate in preventative/ prophylaxes therapies."

After a disciplinary hearing on January 15, 2020, Baltas was found guilty of the disciplinary charge. At his hearing, Baltas explained that he had never taken the tuberculosis test in Connecticut and had received an alternative x-ray instead because "Conn[ecticut] law dictates [that] he has an absolute right to refuse any medical treatment free from adverse action." Nurse Anderson explained that the VDOC does not permit an alternative x-ray unless it is to "confirm or deny" a positive tuberculosis test and that disciplinary action is pursued when an inmate refuses the tuberculosis test because the "unacceptable risk an untested inmate poses to the gen[eral] pop[ulation]." Baltas appealed and Warden Kiser overturned the conviction and dismissed the charge.

---

[17] To the extent that any of the nurses may have threatened Baltas, a threat does not rise to the level of a constitutional deprivation. *Henslee v. Lewis*, 153 F. App'x 178, 180 (4th Cir. 2005) (citing *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979)). Moreover, despite any threats, Baltas continued to receive medical treatment.

Thereafter, during a medical examination of the infection in his hand, Nurse Ball—"at Nurse Anderson's insistence"—requested that Baltas take a tuberculosis test. Baltas refused in writing and noted that he would consent to an alternative x-ray test, but Nurses Ball and Anderson refused to provide one.

On January 22, 2020, Nurse Anderson informed Baltas that if he did not take the tuberculosis test, he would remain in the RHU and be issued another disciplinary charge. Baltas allowed the tuberculosis test to be given to him but claims that he was "forced" to do so under the threat of adverse action.

Based on his allegations, it appears that Nurse Ball was not present when Baltas ultimately agreed to submit to the tuberculosis test. Nurse Ball's request that Baltas take a tuberculosis test does not state a viable claim of deliberate indifference to a serious medical need. Further, Baltas's allegations do not show that Nurse Anderson was deliberately indifferent to a serious medical need when she requested that he take the tuberculosis test or when she informed him that his continued refusal would result in a disciplinary charge and/or assignment to the RHU. Moreover, Baltas does not allege a significant injury that was caused by the tuberculosis test he received. To be sufficiently serious to give rise to a constitutional claim, the medical need generally must risk loss of life, permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer*, 511 U.S. at 832-35; *Sosebeev. Murphy*, 797 F.2d 182-83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978); *Rush v. VanDevander*, No. 7:08cv53, 2008 U.S. Dist. LEXIS 13592, at *6, 2008 WL 495651 (W.D. Va. Feb. 21, 2008). While Baltas may have preferred the x-ray test, the fact that

Baltas did not receive his desired treatment is not a constitutional violation. Accordingly, the court will grant defendants' motions to dismiss these claims.[18]

### F. Claim 9–Sexual harassment and threats

In Claim 9, Baltas argues that defendants Officers A. Mullins and Milgrim violated the Eighth Amendment and the Prison Rape Elimination Act ("PREA") when they sexually harassed and threatened him. In support of his claim, Baltas alleges that on December 30, 2019, Officer A. Mullins made "sexually harassing statements" while Baltas was kneeling to have restraints removed, indicating that Baltas should perform oral sex on him. He also alleges that on March 2, 2020, during a cell search, Officer Milgrim threatened to "break his ass" and, on March 21, 2020, Officer Milgrim said that he "intended to rape his shit hole." Baltas does not describe the circumstances surrounding the March 21 statement. In all three instances, he does not allege that either Officer A. Mullins or Officer Milgrim physically touched him while making the statements or that they subsequently engaged in conduct that would make Baltas believe that either defendant would actually sexually abuse him based on their statements.

---

[18] To the extent Baltas is attempting to raise a claim that submitting to the tuberculosis test violated his religious rights, his allegations are insufficient to state a plausible claim for relief. To state a viable claim under the First Amendment, a plaintiff must demonstrate that the defendant prison official's actions or policies place a substantial burden on his free exercise of his sincere religious belief. *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981). Baltas generally alleges that the tuberculosis test violated his "personal religious beliefs" without stating his religion, the specific belief the tuberculosis test violated and why it was a violation, or any factual details about the components/process of the tuberculosis test that violated his religion. The plaintiff bears the initial burden of showing a substantial burden on his religious exercise. *DePaola v. Va. Dep't of Corr.*, No. 7:12-cv-00592, 2014 U.S. Dist. LEXIS 61165, at *8–9 (W.D. Va. May 2, 2014) citing 42 U.S.C. § 2000cc-2(b); *Lovelace v. Lee*, 472 F.3d 174, 185–87 (4th Cir. 2006). "[A] substantial burden on religious exercise occurs when a state or local government . . . 'put[s] substantial pressure on the adherent to modify his religious behavior and significantly violate his beliefs.'" *Lovelace*, 472 F.3d at 187. A burden that is merely an "inconvenience on religious exercise" is not "substantial." *Konikov v. Orange County, Fla.*, 410 F.3d 1317, 1323 (11th Cir. 2005). Baltas does not allege how—or why—his eventual consent to the tuberculosis test violated any established religious belief. Baltas's vague, unsupported claim that the tuberculosis test violated his "personal religious beliefs" does not demonstrate that there was a substantial burden on his religious exercise and, therefore, fails to state a viable claim for relief.

Although these allegations fail to state a claim for relief under PREA, the court will allow the Eighth Amendment claim to proceed against Officer Milgrim.

It is well established that there is no private cause of action for a violation of PREA. *See, e.g., Taylor v. Worrick*, No. 2:16cv3084, 2016 U.S. Dist. LEXIS 183578, at *17, 2016 WL 11190496, at *7 (D.S.C. Nov. 22, 2016) (citing cases). Accordingly, the court will grant defendants' motion to dismiss to the extent that Baltas attempts to raise this claim under PREA.[19]

While "severe or repetitive sexual abuse of a prisoner by a prison official can violate the Eighth Amendment," *Sconiers v. Lockhart*, 946 F.3d 1256, 1267 (11th Cir. 2020), "verbal taunts . . . however distressing" do not violate a prisoner's constitutional rights under the Eighth Amendment. *Edwards v. Gilbert*, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989); *see also Henslee v. Lewis*, 153 F. App'x 178, 180 (4th Cir. 2005) *Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004) ("Although prisoners have a right to be free from sexual abuse, whether at the hands of fellow inmates or prison guards, the Eighth Amendment's protections do not necessarily extend to mere verbal sexual harassment."); *Barney v. Pulsipher*, 143 F.3d 1299, 1310 n.11 (10th Cir. 1998) ("Although plaintiffs allege Mr. Pulsipher subjected them to severe verbal sexual harassment and intimidation, these acts of verbal harassment alone are not sufficient to state a claim under the Eighth Amendment."). The Constitution does not "protect against all intrusions on one's peace of mind." *Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir. 1991). Verbal harassment or idle threats to an inmate, even to an extent that it causes an inmate fear or

---

[19] The court notes that this determination does not prevent Baltas from reporting the defendants' statements to the appropriate prison officials as a PREA complaint.

emotional anxiety, do not constitute an invasion of any identified liberty interest. *Morrison v. Martin*, 755 F. Supp. 683, 687 (E.D.N.C. 1990), *aff'd* 917 F.2d 1302 (4th Cir. 1990) (finding that the threatening language of a prison official, even if true, does not amount to constitutional violation); *Emmons v. McLaughlin*, 874 F.2d 351, 354 (6th Cir. 1989) (stating verbal threats causing fear for plaintiff's life not an infringement of a constitutional right); *Lamar v. Steele*, 698 F.2d 1286 (5th Cir. 1983) ("Threats alone are not enough. A [§] 1983 claim only accrues when the threats or threatening conduct result in a constitutional deprivation."); *Fisher v. Woodson*, 373 F. Supp. 970, 973 (E.D. Va. 1973) ("[T]hreatening language and gestures of [a] penal officer do not, even if true, constitute constitutional violations.").

In this case, Baltas does not allege sexual abuse or any other physical contact relating to the statements made to him by either of the named defendants. And, while propositioning Baltas for oral sex or threating to "break his ass" may be wholly unacceptable, unprofessional, and inappropriate, it has generally been found to be the type of verbal harassment that is not actionable under the Eighth Amendment. *See Best v. Balt. Cty.*, No. ELH-19-2344, 2021 U.S. Dist. LEXIS 43927, at *48 (D. Md. Mar. 9, 2021) (an officer telling an inmate that the cameras were present so that they could watch inmates "jerk off," failed to state a constitutional claim); *Harper v. Campbell*, No. SAG-20-170, 2021 U.S. Dist. LEXIS 27373, at *3 (D. Md. Feb. 12, 2021) (an officer telling an inmate to "suck his white dick and [that] he would stick a broom stick up [his] shitty ass" failed to state a constitutional claim); *Green v. Owens*, No. 7:20cv320, 2020 U.S. Dist. LEXIS 214235, at *1 (W.D. Va. Nov. 17, 2020) (an officer asking to see the inmate's "large penis" and offering to pay him for sex after his release from incarceration failed to state a constitutional claim); *Morales v. Mackalm*, 278 F.3d 126, 132 (2d Cir. 2002) (an officer

asking an inmate to have sex with her and to masturbate in front of her and other female staffers did not rise to the level of Eighth Amendment violation). But the court cannot say with certainty, at this early stage, that this same principle applies to Baltas's allegations that Officer Milgrim threatened to rape him on multiple occasions. *See e.g.*, *In re Watkins Litig.*, 829 F. App'x 428, 431 (11th Cir. 2020) (holding that a guard's angry and repeated threats to rape an inmate in his custody is conduct objectively more serious than mere vulgar words or gestures.) And, some other circuits have at least held out the possibility that verbal threats, under certain circumstances, may be sufficient to state a constitutional claim. *See Chandler v. D.C. Dep't of Corr.*, 145 F.3d 1355, 1360-61, (D.C. Cir. 1998) ("Although a verbal threat standing alone is generally inadequate to state a constitutional claim, such a threat could violate the Eighth Amendment if the resulting harm were sufficiently severe."); *cf. Freitas v. Ault*, 109 F.3d 1335, 1338 (8th Cir. 1997) (stating that "sexual harassment or abuse of an inmate by a corrections officer . . . may well result in severe physical and psychological harm," which may "constitute the unnecessary and wanton infliction of pain forbidden by the Eighth Amendment" (citations and quotation marks omitted)). Accordingly, the court will grant defendants' motion to dismiss as to the alleged statement made by Officer A. Mullins but will deny the motion to dismiss as to the statements allegedly made by Officer Milgrim.

### G. Claim 13–Mail

In Claim 13, Baltas alleges that defendant Officer Stanley violated his rights under the First and Sixth Amendments when he interfered with Baltas's receipt of mail. In support of this claim, Baltas alleges that Officer Stanley denied Baltas "publications, magazines,

newspapers, etc.," and that Officer Stanley "open[ed] his legal mail outside his presence." Baltas's allegations fail to state a cognizable claim upon which relief may be granted.

Though incarcerated, an inmate "retains those First Amendment rights not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). A prison's restrictions on a prisoner's mail are justified if (1) the challenged regulation or practice furthers an important or substantial government interest unrelated to the suppression of expression; and (2) the challenged practice only restricts the First Amendment freedoms no more than necessary to protect the government interest involved. *Thornbough v. Abbott*, 490 U.S. 401, 411-14 (1989).

Here, other than refusing to consent to VDOC's personal correspondence policy, it is unclear what publications Baltas claims Officer Stanley withheld from him or why.

From the allegations in Baltas's amended complaint, it is clear that he disagrees with VDOC's mail policy requiring that most incoming mail be photocopied. Baltas admits that he has "refused to sign" the VDOC's mail policy because he apparently believes the policy does not apply to him. Because he refuses to accept the VDOC's mail policy, Baltas's incoming "social mail" and publications are not delivered to him.

Without further factual allegations, the court cannot determine whether Baltas has any sort of First Amendment claim. To the extent he is simply challenging VDOC's correspondence policy requiring the photocopying of incoming personal correspondence and a limit to a total of six pages per envelope, these issues have been addressed and have passed constitutional muster. *See, e.g., Couch v. Clarke*, No. 7:18cv49, 2019 U.S. Dist. LEXIS 54256, 2019 WL 1433777 (W.D. Va. Mar. 29, 2019); *Bratcher v. Clarke*, No. 1:17cv474, 2018 U.S. Dist.

LEXIS 166939, 2018 WL 4658684 (E.D. Va. Sept. 26, 2018) (vacated and remanded on the basis of mootness following the plaintiff's release from prison). Baltas's claims fail for the same reasons the inmate-plaintiffs failed in *Couch* and *Bratcher*. More specifically, Baltas fails to include any specifics to even permit the court to determine whether a First Amendment violation has actually occurred. Moreover, to the extent he is making a facial challenge to the policy, he has failed to name a proper defendant or allege that Officer Stanley is the creator of that policy. The mail policy at issue comports with the First Amendment for the reasons outlined in the *Bratcher* and *Couch* cases. Baltas cannot manufacture constitutional claims simply by withholding his consent to a valid policy and then complaining that he is not receiving his mail. Accordingly, the court will grant defendants' motion to dismiss this claim.

The Supreme Court has plainly held that the Sixth Amendment's "reach is only to protect the attorney-client relationship from intrusion in the criminal setting." *Wolff v. McDonnell*, 418 U.S. 539, 576 (1964). Baltas fails to allege that the mail that was opened in this case involved his criminal case(s). Further, in order to establish that an inmate's Sixth Amendment rights have been violated by the opening of his incoming legal mail outside of his presence, he must show that there was some "actual harm or prejudice" to his ability to communicate with the court or his counsel. *See, e.g., Chiang v. Lappin*, No. RDB-07-1017, 2008 U.S. Dist. LEXIS 57113, at *28, 2008 WL 2945434, at *9 (D. Md. July 24, 2008) (citing cases). Moreover, the inmate must allege a "pattern or practice" of prison staff opening or interfering with the inmate's legal mail. *Id.* (citing *Bryant v. Winston*, 750 F. Supp. 733, 734 (E.D. Va. 1990) (holding that the negligent opening of an inmate's legal mail, on limited occasion and not as part of any pattern, is not actionable under § 1983)).

Regarding Baltas's allegation that Officer Stanley opened his legal mail outside of his presence: This allegation likewise fails to state a claim for relief. "[N]umerous courts have held that the negligent or inadvertent opening of legal mail outside the presence of an inmate, in isolated instances, does not constitute an independent constitutional violation." *Guinn v. Crumpler*, No. 7:18cv274, 2020 U.S. Dist. LEXIS 59139, at *34, 2020 WL 1666301, at *12 (W.D. Va. Apr. 3, 2020) (citing *El-Amin v. United States*, No. 1:18-00282, 2018 U.S. Dist. LEXIS 194246, at *16 n.8, 2018 WL 5993582, at *6 n.8 (W.D. Va. July 31, 2018) (collecting cases)).

Baltas alleges that Officer Stanley told him that the mail had arrived opened and that he had previously received "hoards [*sic*] of incoming legal mail daily" at Red Onion. He also alleges he received legal mail from the Connecticut appellate court. Simply because one envelope was opened outside of Baltas's presence does not establish a Constitutional violation.

Finally, to the extent Baltas claims that Officer Stanley – or any other defendant – improperly returned his legal mail to his attorney, his claim also fails. In Exhibit 16 to his amended complaint, Baltas includes an affidavit from his attorney along with two envelopes evidencing "legal mail" that was returned to the attorney based on Baltas's refusal to consent to the VDOC's mail policy. However, review of the envelopes reveals that neither of them indicate anywhere on the face of the envelope that the enclosed correspondence is legal mail. Further, the return address label does not indicate that the sender is an attorney. Whoever received and returned this mail would have had no way of knowing that it was legal mail and should have been delivered to Baltas despite his refusal to consent to the mail policy. The court concludes that Baltas's allegations fail to establish a violation of his constitutional rights and, therefore, the court will grant defendants' motion to dismiss this claim.

### H. Claim 21–Solitary confinement without due process

In Claim 21, Baltas claims that UM Miller, AW Fuller, Warden Kiser, Director Clarke, and CDOC Commissioner Cook violated his right to due process by housing him in segregation. The facts Baltas alleges fail to state a claim against any of these defendants.

"To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). For an inmate to establish a constitutionally protected liberty or property interest, he must allege an "atypical and significant" hardship or deprivation in relation to the ordinary incidents of prison life. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (holding that disciplinary segregation did not present the type of atypical, significant deprivation that would give rise to a protected liberty interest). Confinement in segregation, standing alone, does not trigger due process protections. *Barbee v. Anderson*, Civil Action No. 7:19cv306, 2020 U.S. Dist. LEXIS 43133, at *14–16 (W.D. Va. Mar. 12, 2020). Ordinarily, assignment to administrative segregation does not create an atypical and significant hardship. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (holding that administrative segregation is part of the ordinary incidents of prison life). Mere limitations on privileges, property, and activities for administratively segregated inmates "fall[] within the expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485; *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a prisoners' [*sic*] location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges—matters which every prisoner can anticipate are contemplated by his original sentence to prison—are necessarily functions of prison

management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently").

First, Baltas's allegations do not show that any of the named defendants are responsible for his continued placement in the RHU. Baltas claims that in mid-February 2020, he wrote to Warden Kiser, AW Fuller, and UM Miller, advising them that, pursuant to Connecticut law and CDOC administrative procedures, he could not be kept in the RHU for more than 15 days, and he requested his release "or to be provided his property." While he is housed in Virginia, however, Baltas is subject to VDOC operating procedures applicable to other Virginia inmates. He also wrote to Director Clarke and CDOC Commissioner Cook regarding his "unending placement in isolation," and requested his release from isolation and return to Connecticut. Baltas alleges that Warden Kiser, UM Miller, and Director Clarke have "expressly admitted that [Baltas] has been kept in [the] RHU because he cannot be safely housed anywhere in V[irginia] and they cannot guarantee his safety anywhere in V[irginia]." Just because all of these defendants know that Baltas is housed in the RHU does not necessarily mean they are responsible for his continued placement there. To the extent Baltas attempts to hold these defendants liable as supervisors, his attempt fails. A supervisor can "be held liable for the acts of a subordinate 'only by proof of [his] direct culpability in causing the injury either by directly authorizing it or by expressly or tacitly condoning by inaction a known pattern of comparable coworker conduct.'" *White v. Downs*, No. 95-2177, 1997 U.S. App. LEXIS 9326, at *12, 1997 WL 210858, at *4 (4th Cir. Apr. 30, 1997) (quoting *McWilliams v. Fairfax County Bd. of Supervisors*, 72 F.3d 1191, 1197 (4th Cir. 1996)). Without the supervisor's authorization of the alleged misconduct or his indifference to a "known pattern of [] unconstitutional

conduct," a supervisory liability claim fails. *Id.* Baltas has alleged nothing to support these defendants' knowledge of or participation in any decision regarding his specific housing assignment.[20]

Further, even if Baltas had sufficiently alleged that any of the defendants were responsible for his continued confinement in the RHU, the conditions that he challenges do not demonstrate an atypical and significant hardship as compared to the ordinary incidents of prison life. This court has addressed similar allegations regarding the conditions at Red Onion and found that those complaints failed to state a claim for relief. *See, e.g., DePaola v. Va. Dep't of Corr.*, No. 7:14cv692, 2016 U.S. Dist. LEXIS 132980, 2016 WL 5415903, at *4 (W.D. Va. Sept. 28, 2016) (citing *Sandin v. Connor*, 515 U.S. 472, 485 (1995)). Specifically, his allegations about continuous cell lighting fail to state a claim for a violation of the Eighth Amendment. *See, e.g., Gochie v. Beaver*, No. 5:18cv148, 2019 U.S. Dist. LEXIS 80254, at *12, 2019 WL 2088426, at *4 (W.D.N.C. May 13, 2019) (holding that claims about poor lighting failed to state a claim for an Eighth Amendment violation); *Turner v. Watson*, No. 7:08cv524, 2008 U.S. Dist. LEXIS 102973, at *7, 2008 WL 5350708, at *2 (W.D. Va. Dec. 22, 2008) (dismissing an inmate's Eighth Amendment claims regarding continual in-cell lighting that the inmate admitted was dimmed in the evening hours). *See also Murry v. Edwards County Sheriff's Dep't.*, 248 F. App'x 993, 998-99 (10th Cir. Oct. 1, 2007) (holding that occasional sleep disturbances caused by continual lighting, leading sometimes to mild physical symptoms, was not sufficiently serious to result in an Eighth Amendment violation); *Hunnewell v. Warden*, 19 F.3d

---

[20] To the extent that he alleges that UM Miller notified him of changes to his housing or security assignments, these allegations do not demonstrate that UM Miller was responsible for making these decisions and, instead, only reflect that UM Miller delivered the news to Baltas about the status changes.

7 (1st Cir. 1994) (holding that inmate's claim that "cell lights are on during the night making it difficult to sleep" and "the ventilation system blows dust and fibers into his cell causing him to have headaches and bloody noses" was insufficient to state a claim under the Eighth Amendment).

Baltas's claims about the food portions also fail to allege a constitutional violation. *See, e.g., McMillian v. North Carolina Cent. Prison*, No. 5:10-CT-3037-FL, 2013 U.S. Dist. LEXIS 37376, at \*22, 2013 WL 1146670, at \*7 (E.D.N.C. Mar. 19, 2013) (citing cases from the Fourth Circuit Court of Appeals and other district courts within the Fourth Circuit regarding deficiencies in food quality and holding that such claims generally fail to amount to a violation of the Eighth Amendment). This court made similar observations in *Barnes v. Huffman*, No. 7:06cv745, 2007 U.S. Dist. LEXIS 82697, at \*18-19, 2007 WL 3339311, at \*4 (W.D. Va. Nov. 7, 2007), and Baltas's allegations do not justify an exception to this state rule of law.

His claims about restrictions on the amount and type of property he is permitted to possess also fail to state a claim because inmates have no protected property interests in items deemed to be contraband. *Bratcher*, 2018 U.S. Dist. LEXIS 166939, 2018 WL 4658684, at \*16 (citing *Parratt v. Taylor*, 451 U.S. 527, 529–31 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)). Contraband aside, the intentional deprivation of property by a government official does not violate the Due Process Clause if a plaintiff has a meaningful post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). The Virginia Tort Claims Act adequately provides for this remedy in Virginia. *Barbour v. Wheeler*, No. 7:10cv89, 2010 U.S. Dist. LEXIS 42761, at \*2-3, 2010 WL 1816625, at \*1 (W.D. Va. Apr. 30, 2010) (citing Va. Code. § 8.01-195.3).

In addition, his complaints about a lack of access to schooling, programming, a window, a mirror, storage containers for his property, hot food, and trips to the dining hall, as well as limits on his commissary spending, limitation to non-contact visitation, community nail clippers, 40-minute cell checks, showers three times per week, outdoor recreation for one hour per day five days per week, and limitations on his telephone usage, do not support an Eighth Amendment claim. *See, e.g., Lewis v. Hoke Cty.*, No. 1:17CV987, 2020 U.S. Dist. LEXIS 158276, at *27 (M.D.N.C. Sep. 1, 2020) (citing cases and holding that the temperature of an inmate's food does not rise to the level of a constitutional violation); *Dowling v. Central Office*, No. 5:18-00055, 2018 U.S. Dist. LEXIS 121650, at *23-24, 2018 WL 4381290, at *7 (S.D. W. Va. Jan. 19, 2018) (holding that there is no Eighth Amendment right to educational and work opportunities while incarcerated and citing cases holding the same); *Harding v. Aylor*, No. 7:14cv302, 2015 U.S. Dist. LEXIS 118313, at *4, 2015 WL 5178185, at *2 (W.D. Va. Sept. 4, 2015) (finding no constitutional violation based on lack of a window and 24-hour illumination); *Hairston v. Draper*, No. 4:18cv29, 2019 U.S. Dist. LEXIS 41130, 2019 WL 1212111 (W.D. Va. Mar. 14, 2019) (noting there is no Eighth Amendment violation based on a lack of a window); *DePaola v. Ray*, No. 7:12cv139, 2013 U.S. Dist. LEXIS 117182, 2013 WL 4451236 (W.D. Va. July 22, 2013) (finding no Eighth Amendment violation based, in part, on a lack of a mirror); *Graham v. Stallard*, No. 7:17cv35, 2020 U.S. Dist. LEXIS 177366, at *41–42, 2020 WL 5778790, at *15 (W.D. Va. Sept. 28, 2020) (finding that the opportunity to shower approximately every other day was not an Eighth Amendment violation and citing cases in support); *Thomas v. Drew*, 365 F. App'x 485, 488 (4th Cir. 2010) (affirming a lower court's award of summary judgment to prison officials who banned an inmate from making telephone

calls until June 23, 2065, and imposed a loss of commissary until December 18, 2038, and finding specifically that the telephone restriction was not an Eighth Amendment violation); *Overton v. Bazzetta*, 539 U.S. 126, 146 (2003) (holding that regulations restricting visitation did not deprive an inmate of basic necessities, or fail to protect an offender's health or safety).

Moreover, although Baltas states that he been housed in the RHU in solitary confinement without "due process of any kind," he also alleges that a classification hearing was held in December 2019 and that his housing and security assignments changed on January 3, 2020 (general population),[21] January 21, 2020 (RHU pending investigation), February 3, 2020 (Step Down 2), and March 23, 2020 (Step Down 1), all before he filed this action on March 30, 2020. This it appears—based on his own allegations—that Baltas did receive at least some due process regarding his housing assignments. Baltas's disagreement with the determinations does not state a viable due process claim against the defendants. Accordingly, the court will grant defendants' motion to dismiss this claim.[22]

### I. Claim 22–Right to association

In Claim 22, Baltas claims that defendants Officer Stanley, AW Fuller, Director Clarke, and CDOC Commissioner Cook have denied his "right to association," "actively destroyed his personal relationships" by using "false information," and refused to provide him notice or due process when they return his mail. The court concludes that his allegations fail to state a cognizable claim.

---

[21] After Baltas was moved to a general-population cell on January 3, 2020, UM Miller advised him that he had been "classified" according to VDOC operating procedures.

[22] The court dismisses the claim against CDOC Commissioner Cook pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

In support of these claims, Baltas alleges that because he is housed in Virginia, his "friends, family, and associates" from Connecticut are unable to visit him. He does not allege that the defendants do not permit these people to visit.[23] In addition, at times during his incarceration in Virginia, his access to the telephone has been limited to unscheduled call times or completely denied, making it difficult for him to speak to his friends, family, and associates on the telephone. He does not allege that he is not permitted to call his friends, family, and associates during these "odd times." Finally, because Baltas refuses to sign the VDOC's mail policy, any mail that his social contacts send to him is returned to them indicating that he did not want to receive or had rejected his mail. Baltas does not allege that he is unable to send mail to his friends, family, and associates. And, he admits that he has "refused to sign" the VDOC's mail policy which would allow him to receive photocopies of incoming social mail. To the extent he claims that he did not receive notice that his mail would be rejected, his claim is belied by the record. Officer Stanley specifically informed Baltas on or about January 17, 2020, that his "incoming social mail and publications would be disposed of until such time as he signs the inmate authorization form." Again, on February 10, 2020, Baltas was informed he would only receive legal mail until he agreed to VDOC's mail policy. Baltas plainly alleges that he received notice that his incoming mail would not be delivered to him until he consented to the policy. The court concludes that Baltas's allegations do not state a plausible claim for relief and, therefore, the court will grant defendants' motion to dismiss these claims.[24]

---

[23] The court notes that visitation within the VDOC is currently limited due to restrictions in place because of the COVID-19 pandemic; however, Baltas's complaints about visitation stem from his distance from his friends, family, and associates, not from the pandemic restrictions.

[24] The court dismisses the claim against CDOC Commissioner Cook pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

## J. Claim 23–Access to courts

In Claim 23, Baltas alleges that Officer Stanley, AW Fuller, Warden Kiser, Director Clarke, and CDOC Commissioner Cook denied him access to courts by denying him access to his counsel, state agencies, and the CDOC. The court concludes that Baltas's allegations do not state a cognizable federal claim.

As to the defendants named in this claim, Baltas states that he wrote inmate requests to Warden Kiser and AW Fuller on January 14, 2020, concerning his "need[s] of access to a typewriter" and an unrecorded telephone for him to speak with his attorney. On January 27, 2020, Baltas's Connecticut appellate court filings were returned to him for being handwritten. The next day, Baltas spoke with Warden Kiser and requested the processing of his property be expedited to provide him access to his personal typewriter. Baltas also told AW Fuller that he needed access to a typewriter (or typing services) and the law library to litigate his many *pro se* matters. Baltas alleges that he was not allowed to possess a typewriter. Baltas also requested either access to a "non-recorded" telephone or, in the alternative, specific call times to use the recorded telephone so that he could call his attorneys, but his requests were denied. At the end of April, Baltas received a notice from the CDOC stating that all the mail they had sent to him had been returned to them, and that they had various documents they needed to send to him, including grievances, "FOI materials," and "state property claims." Baltas wrote to AW Fuller, Warden Kiser, and Director Clarke about being denied access and communications with the CDOC and he alleges they "expressly refused to cure this." Baltas claims that, "since being housed in" Virginia, Officer Stanley has "improperly returned all" of Baltas's incoming non-legal correspondence to the senders and "falsely" wrote that Baltas did "not want to

receive [their] mail" or had "rejected [their] mail." Baltas also alleges that Officer Stanley improperly returned his legal mail from various sources, including "legal/privileged mail from government agencies, bar associations, and courts, and various attorneys." In support of this assertion, Baltas provides copies of two envelopes that his attorney sent to him at Red Onion which were returned to the attorney. As the court previously noted, however, there are no markings on the envelopes to indicate that the sender was an attorney. Baltas wrote to AW Fuller, Warden Kiser, Director Clarke, and CDOC Commissioner Cook about his lack of access to legal mail and courts and he claims that "they responded" by denying the occurrences and "refus[ing] to cure" the issue. Baltas also alleges that during his incarceration in Virginia, he has received "no legal visits, depriving him of access to counsel." He claims that he has also been denied communications and private communications with his counsel because he is "forced" to make all telephone calls on recorded telephone lines at "odd times."

To the extent Baltas claims that any of the defendants interfered with his access to prison grievance forms or the grievance process, his allegations do not give rise to an independent constitutional claim. The Fourth Circuit held in *Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994)—and reiterated more recently in *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533 (4th Cir. 2017)—that "inmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Id.* at 541; *see Adams*, 40 F.3d at 75 ("The Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state."). Relying on *Adams*, district courts—including this one—have held that a prison official's failure to comply with a grievance procedure is not actionable under § 1983. *E.g.*, *Brown v. Va. Dep't of Corr.*, No. 6:07cv33, 2009 U.S. Dist. LEXIS 3022, 2009 WL 87459, at *13

(W.D. Va. Jan. 9, 2009) ("[T]here is no liability under § 1983 for a prison administrator's response to a grievance or appeal."); *Oliver v. Gray*, No. 7:09cv4, 2009 U.S. Dist. LEXIS 10714, 2009 WL 366150, at *2 (W.D. Va. Feb. 12, 2009), *aff'd*, 360 F. App'x 417 (4th Cir. 2010) ("Because a state grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the state's grievance procedure is not actionable under § 1983."). Accordingly, the court concludes that Baltas's allegations fail to state a plausible claim for relief.

Further, Baltas's claims concerning access to courts also fail. In order to state a First Amendment "access-to-courts" claim, a plaintiff must allege some actual interference with his right of access and must produce actual injury or specific harm to some litigation involving a challenge to the conditions of his confinement or the fact of his confinement. *Lewis v. Casey*, 518 U.S. 343, 354 (1996); *Strickler v. Waters*, 989 F.2d 1375 (4th Cir. 1993). "In order to plead a claim that he was denied access to the courts, [] a plaintiff must identify with specificity, a non-frivolous legal claim that the defendants' actions prevented him from litigating." *O'Quinn v. Baker*, No. 7:08cv426, 2008 U.S. Dist. LEXIS 88656, at *1–2, 2008 WL 4275964, at *1 (W.D. Va. Sep. 17, 2008 (citing *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *Lewis*, 518 U.S. at 353 n.3). Such an allegation must also show an intent to frustrate his access to the courts. *See, e.g., Fentress v. Johnson*, No. 7:10cv468, 2010 U.S. Dist. LEXIS 127244, at *2, 2010 WL 497969, at *1 (W.D. Va. Dec. 2, 2010) (denying a preliminary injunction motion and noting that plaintiff's claims were unlikely to suffer irreparable harm because he had failed to establish any defendant's intent to frustrate his access to the courts); *see also Bey v. Bailey*, No. 3:11cv489, 2013 U.S. Dist. LEXIS 81158, at *5, 2013 WL 2480661, at *2 (W.D.N.C. Jun. 10, 2013) ("It is

well-settled that negligence is not actionable in a § 1983 action." (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986)).

Baltas has failed to allege that any interference—whether intentional or otherwise—actually harmed some aspect of his litigation. Baltas alleges that the Connecticut appellate court returned his handwritten document to him because it was not typed, but he does not allege that it actually harmed his litigation. Further, Baltas has not alleged facts to support an inference that Officer Stanley, AW Fuller, Warden Kiser, Director Clarke, or CDOC Commissioner Cook intentionally frustrated his access to the courts. Accordingly, the court concludes that his allegations fail to state a cognizable access-to-courts claim and, therefore, will grant defendants' motion to dismiss claim 23.[25]

## K. Claim 24–Retaliation for filing this action

In Claim 24, Baltas alleges that defendants Lt. Lambert, UM Miller, and Capt. Franklin retaliated against him for filing this case when they threatened him, spread false rumors about him, slandered him, and orchestrated and solicited acts of violence against him. Baltas's allegations, however, are far too vague to state a cognizable clam for relief.

"[T]o state a colorable retaliation claim under Section 1983, a plaintiff must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct. *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017). A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights. *Id.*

---

[25] The court dismisses the claim against CDOC Commissioner Cook pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

Vague and general allegations of retaliation are insufficient. *See Adams*, 40 F.3d at 74 (finding that inmate must present more than conclusory allegations of retaliation).

Baltas originally filed this case on March 30, 2020, and alleges that Lt. Lambert, UM Miller, and Capt. Franklin retaliated against him *after* he filed the case. His only allegations in support of his retaliation claim is that "[s]ince filing this action [Lt.] Lambert, [UM] Miller, [Capt.] Franklin, and other DOC officials not yet identified" have retaliated against him by slandering him, threatening him, and falsely spreading the rumor that is a "snitch." Baltas fails, however, to establish adequate personal involvement on behalf of the three named defendants.

Baltas's factual allegations in support of this claim are vague and lack any specific allegations as to what each individual defendant actually did to him that violated the law. Liability in a civil rights case is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001); *see also Garraghty v. Va. Dep't of Corr.*, 52 F.3d 1274, 1280 (4th Cir. 1995). "A public officer or agent is not responsible for the misfeasances or positive wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the sub-agents or servants or other persons properly employed by or under him, in the discharge of his official duties." *Robertson v. Sichel*, 127 U.S. 507, 515–16 (1888); *see also Gray v. Stolle*, No. 3:11cv546, 2013 U.S. Dist. LEXIS 116478, at *33, 2013 WL 4430915, at *10 (E.D. Va. Aug. 16, 2013) (granting motion for summary judgment where the inmate plaintiff "fail[ed] to establish any personal involvement of [the] Defendant [] in the deprivation of his First Amendment rights"). Without direct personal involvement, the only remaining basis for suit against these defendants would be under *respondeat superior*, which is not available in actions brought under § 1983. *Ashcroft*, 556 U.S. at 676 ("[B]ecause vicarious liability is inapplicable to

. . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

Here, Baltas alleges—with no other factual support—that Lt. Lambert, UM Miller, and Capt. Franklin "retaliated against him" because they threatened him. Nothing about this allegation establishes which defendants threatened Baltas, when they did so, or what— specifically—that said or did to him that was threatening. The court concludes that Baltas's allegations of retaliation fail to state a cognizable federal claim and, therefore, will grant defendants' motion to dismiss claim 24.

### L. "Claim" 26–Any other claims

Baltas lists "Claim" 26, as "any and all claims, causes, and arguments not specifically and/or artfully raised in his amended complaint." After liberally construing his amended complaint, as the court is required to do, the court has identified the following allegations that could state a viable claim for relief against a named defendant:

1. An Eighth Amendment claim against Sgt. Meade based on the allegations that Sgt. Meade gave an inmate a weapon, solicited him to attack Baltas, and the inmate did attack Baltas, causing severe wounds;

2. An Eighth Amendment claim against Capt. Franklin based on the allegations that Capt. Franklin admitted that he had been involved in setting up the attack on Baltas; and

3. An Eighth Amendment claim against AW Fuller based on the allegations that AW Fuller refused to loosen the restraints while Baltas was at the hospital after Baltas complained to him about pain and difficulty breathing in them.

Defendants have not addressed these claims. Pursuant to Standing Order 2020-16, the court will allow these defendants to file any motion for summary judgment within 60 days. If no motion is filed, this matter will be set for trial.

## IV.

For the reasons discussed, the court will grant in part and deny in part the non-medical defendants' motion to dismiss (ECF No.72); grant the medical defendants' motions to dismiss (ECF Nos. 54 and 76); dismiss Claims 4 and 21–23 against CDOC Commissioner Cook without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii); grant Baltas's motion to serve CDOC Commissioner Cook; and allow the remaining defendants to file any motion for summary judgment on the remaining claims. The claims that are remain pending in this action are: Claim 2 against defendants Officer Allen, Officer Clem, Sgt. Little, Sgt. Meade, and Officer A. Mullins, Claim 4 against defendants Director Clarke, AW Fuller, and UM Miller, Claim 5 against defendant AW Fuller, a retaliation claim against CDOC Commissioner Cook, and Eighth Amendment claims against Sgt. Meade, Capt. Franklin, and AW Fuller.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to Baltas and all counsel of record.

**ENTERED** this 18th of March, 2020.

/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE